**GULF OIL CORPORATION v. YORK et al.**

No. 8952.

Court of Civil Appeals of Texas. Austin.

Nov. 22, 1939.

Rehearing Denied Dec. 13, 1939.

Joe S. Brown, of Houston, and Stanley Hornsby, of Austin, for appellant Gulf Oil Corporation.

Gerald C. Mann, Atty. Gen., and Edgar W. Cale, Asst. Atty. Gen., for appellee Railroad Commission of Texas.

Clower & Bezoni, of Tyler, for appellees C. C. Crawford and J. C. Hawkins.

W. A. Keeling, of Austin, for appellees W. S. York and Dewey Lawley.

McCLENDON, Chief Justice.

This is a Rule 37 case. The appeal is from an interlocutory order denying to the Gulf (Gulf Oil Corporation) a temporary writ enjoining drilling of and production from a second well upon a 2.64-acre tract, known as the Hawkins lease, in the East Texas Oil Field, permit to drill which had been granted by the Railroad Commission upon application of appellees York and Lawley, to whom we refer as applicants. The suit in which the temporary injunction was sought was an appeal from the order granting the permit brought by the Gulf, owner of a lease adjoining the 2.64-acre tract.

The application was made and the permit granted as an exception to Rule 37 "to prevent confiscation of property." The ground for setting aside the order, as set forth in the verified petition, stated substantially, was that the order was arbitrary, unjust and unreasonable, in that it was made without evidence to support it and upon evidence negativing the fact that the well was necessary to prevent confiscation or to protect the vested rights of the applicants as owners of the lease upon the 2.64-acre tract. By amendment to the petition, filed upon leave granted, it was alleged that the well as actually drilled was approximately 60 feet from the point at which it was authorized by the order, which was not compliance, actual or substantial, with the order.

We are granting the sought temporary injunction upon each of the above grounds upon the following conclusive record showing.

The following map shows the Hawkins and surrounding leases, the location of well No. 1 on the Hawkins, the proper location of well No. 2 as authorized and its location as actually drilled, and the location of wells on adjacent leases which had bearing

upon the issue of drainage from the Hawkins lease:

No. 1 and No. 10 and No. 2 Sexton, and that the No. 2 location is justified as a

There were three applications (two original and one rehearing) for the permit, upon each of which there was a hearing before an "Examiner" for the Commission. These respective hearings were on August 11, 1938, February 14, 1939, and May 8, 1939. The first two applications were denied. The third was granted. The entire record of testimony offered at each of these hearings was introduced in evidence upon the hearing for temporary injunction, a résumé of which is embodied in the Examiner's three reports, or "memoranda," the body of each of which we copy in full:

"August 11, 1938.

"It is the applicants' contention that the southern end of their lease is being drained by Gulf No. 16 Sexton, General American

north offset to the General American No. 1 which they show to be 141 feet south of the common line. Mr. Barron testified that the No. 1 well was not sufficient to protect the lease from drainage to the south.

"Protestants pointed out that in Case 9613 the No. 1 well was granted in the geographic center of the tract and that it had been drilled out of location close to the north line. On cross-examination, Mr. Barron testified that when a drainage picture was drawn by taking the midpoint between wells, the applicant's No. 1 well had an opportunity to drain a larger area on the offset leases than the offset wells had an opportunity to drain on this lease. According to the density statement submitted by protestants, the average density

of the adjoining leases in their entirety is 1 well to 7.10 acres and the density of a circular 8 times area is 1 well to 3.02 acres and the density of a rectangle 8 times area is 1 well to 3.02 acres. Applicants now have a density advantage with 1 well to 2.64 acres, and this additional well would give applicants 1 well to 1.32 acres.

"The spacing desired is:

"141 feet north of the south line; midway between east and west lines."

"Feb. 14, 1939.

"This lease is located in the East Texas field where the spacing rule is 330 feet from lease lines and 660 feet between wells.

"This same location was denied by the Commission on September 21, 1938. The case was reset upon the showing by applicants that several additional wells had been drilled in the area. Applicants base their claim to this additional well on the ground that their lease is suffering drainage because of the fact that their No. 1 well is 275 feet north of the south line and the General American Well No. 1 is only 141 feet south of that same line. They also pointed out that the Gulf No. 16 is located 219 feet from the southwest corner of this lease, and that the Gulf has crowded its lease lines in other places on the lease, particularly in the case of its No. 14 well which is 100 feet from the General American's west line.

"Protestants introduced Rule 37 Case No. 9613 to show that well No. 1 on applicant's tract was granted by the Commission in the geographical center of the lease which would place it 120 feet from the north and south lines and that the well was actually drilled off location within 57 feet of the north line. If the well had been drilled where it was granted, it would have a 20 foot advantage over the General American No. 1 instead of being at a 134 foot disadvantage. Protestants also pointed out that the applicants' No. 1 well has a 102 foot spacing advantage over the General American No. 1-A to the north. They also pointed out that there was no direct west offset to applicants' No. 1, so that the situation to the west with the Gulf No. 16 being 219 feet west of the southwest corner was to applicants' advantage over the normal situation. Protestants called attention that M. S. Barron, geologist, witness for applicants in the former hearing, testified that, considering the spacing all around applicants'

lease, applicants now had a spacing advantage. Gulf introduced density statements showing that the average density of all adjoining leases is 1 well to 6.32 acres; the density of a square area 8 times the size of this lease is 3.02 acres per well; and the density of a circular 8 times area is 1 well to 2.81 acres, as compared to applicants' present density of 1 well to 2.64 acres at this time. A second well would give applicants 1 well to 1.32 acres. Protestants contend that the location is not justified on spacing or on density or as an offset.

"The spacing requested is:

"141 feet north of the south line; 230 feet east of the west line."

"May 8, 1939.

"(In longhand: 'reheard')

"This lease is located in the East Texas Field where the spacing rule is 330 feet from lease lines and 660 feet between wells. Well No. 2 on this tract has been denied by the Commission on September 21, 1938, and March 25, 1939. A rehearing was granted by the Commission on April 20, 1939.

"Applicants offered the records made at the two former hearings and contended that the second well was justified on the ground of changed conditions. The changed conditions which applicants pointed out was the drilling of General American Oil Co. Nos. 13, 14, 18, and 19 Sam Williams on the tract adjoining the applicants to the north and east. However, the file covering those wells was introduced and showed that the amended locations for those wells were granted on October 29, 1938, and that wells Nos. 14, 18 and 19 were completed by January, 1939, prior to the second hearing on this No. 2 well. The No. 13 is now being drilled and is located approximately 2000 feet from applicant's lease.

"Protestants contend that there has been no material change in surrounding conditions which would justify a reversal of the Commission's former action since the four wells listed as constituting changed conditions had in fact already been granted, and three of them actually drilled prior to the second hearing, after which the well No. 2 was denied. Protestants further pointed out that the motion for rehearing was based on a request to submit further evidence and that no such evidence had been introduced by applicants. Protestants specifically pointed out the testimony of

M. S. Barron to the effect that applicants' No. 1 well had an opportunity to drain more area of the adjoining leases than the wells on adjoining tracts had an opportunity to drain on applicants' tract, which was given at the former hearing.

"The spacing desired is:

"141 feet north of the south line; 230 feet east of the west line."

■ We have carefully examined the record introduced before the Commission upon the three hearings, the effect of which we find accurately stated in the above Examiner's reports. We not only fail to discover any evidence which would give substantial support to a finding that well No. 2 was necessary to prevent confiscation, but find, on the contrary, that the evidence conclusively shows that well No. 1 (even at its improper location) is amply sufficient to protect the vested rights of applicants in securing to them the recoverable oil in place under their land, or its equivalent, which is the full measure of their vested interest. While the evidence shows there was some excess drainage from wells to the south of the lease, it shows conclusively that this excess was more than compensated for by excess drainage of well No. 1 from tracts to the west, north, east, and southeast. If well No. 1 had been drilled at the granted location, 57 feet farther south, the excess drainage from the south would probably have been overcome entirely.

■ It is now a well settled rule, established by numerous decisions in this and other jurisdictions, that orders of an administrative board, to be valid, must be supported by substantial evidence introduced at a hearing before the board. Absent such substantial supporting evidence, such orders are arbitrary, unreasonable, and baseless. This doctrine has been many times announced by the Federal Supreme Court. We quote, in this connection, from Interstate Commerce Comm. v. Louisville & N. R. Co., 277 U.S. 88, 33 S.Ct. 185, 186, 57 L.Ed. 431, an early leading case upon the subject:

"But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. A finding without evidence is arbitrary and baseless. And if the government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our government. It would mean that, where rights depend upon facts, the Commission could disregard all rules of evidence and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another, is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power.

"In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the 'indisputable character of the evidence.'"

This rule has been applied in this state specifically to orders of the Commission upon applications to drill as exceptions to Rule 37. In Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 945, 99 A.L.R. 1107, our Supreme Court, speaking through Mr. Justice Sharp, said: "The decisions of the Railroad Commission on this question must be based upon proof, and must not be capricious or unreasonable. The mere holding of a hearing does not justify its action. If after a hearing the commission acts without regard to the evidence, or makes a ruling wholly unsupported by the evidence, it cannot be said to have exercised its discretion. And where it is shown that the commission has abused its discretion, or has acted illegally and issued a permit in violation of its rules, the courts are fully authorized to nullify the permit of the commission and prevent its enforcement. Shupee v. Railroad Commission, 123 Tex. 521, 73 S.W.2d 505; 42 Corpus Juris, pp. 691, 692."

In Rabbit Creek Oil Co. v. Shell Petroleum Co., 66 S.W.2d 737, 740, this court, speaking through Justice Blair, held: "Rule 37, and particularly the statutes, require the commission to ascertain the facts with respect to waste as that term is used in the statutes before a permit to drill a well as an exception to rule 37 is granted. These duties are mandatory under the statutes, and, until the commission has ascertained the facts prescribed by these statutes as to waste, it cannot grant a permit to drill a well as an exception to rule 37, and its order granting the permit in question without ascertaining such facts is

deemed to be unjust, unreasonable, or arbitrary in law. Texas Motor Coaches v. Railroad Comm. (Tex.Civ.App.) 41 S.W. (2d) 1074."

Again speaking through Justice Blair, this court, in Humble Oil & Refining Co. v. Railroad Commission, 83 S.W.2d 695, held: "Rule 37 and the statutes applicable, article 6014, and particularly article 6029 (Vernon's Ann.Civ.St.), require the commission to ascertain the aforementioned facts before it grants a permit to drill a well as an exception to rule 37; and its order granting the permits in question without ascertaining such facts would be deemed to be unjust and unreasonable, or arbitrary in law."

The following quotations are from opinions of this court (Justice Baugh writing), the first from Empire Gas & Fuel Co. v. Railroad Commission, 94 S.W.2d 1240, 1243, error refused, and the second from Turnbow v. Barnsdall Oil Co., 99 S.W.2d 1096, 1098, error refused:

"Appellant offered in evidence the recommendation of the deputy supervisor of the commission, who heard the evidence on appellee's application for its permit, and also a transcript of the testimony heard by him, duly authenticated by the reporter for the commission, under its allegation that the commission acted without evidence in granting such permit. This evidence was excluded. In this we think the trial court erred."

"On the first question [the admission in evidence, over objection, of the transcript of the proceedings before the Railroad Commission], an examination of the plaintiff's petition discloses an allegation, in addition to want of notice and hearing, that, if such hearing were had, 'there was no evidence introduced at the hearing before the Railroad Commission * * * showing that said two wells, or either of them, were needed to prevent confiscation,' etc. This is the exact question presented, and decided adversely to the Attorney General's contention, in Empire Gas & Fuel Co. v. Railroad Commission (Tex.Civ.App.) 94 S.W.(2d) 1240 (writ refused), and need not be further considered here."

■ The stated ground for the injunction—that the well as drilled was not located actually or substantially as authorized—is sustained under the holding in Railroad Commission v. Magnolia Petrole-

um Co., Tex.Civ.App., 125 S.W.2d 398, error refused.

The order appealed from is set aside and the temporary injunction granted as prayed for. The clerk will issue the temporary injunction upon appellant's filing a bond, conditioned and payable as required by law, to be approved by the clerk, in an amount agreed upon by the parties, or fixed by the court upon hearing, if the parties fail so to agree.

Temporary injunction granted.