Austin E. STEWART et al., Appellants,

v.

HUMBLE OIL & REFINING COMPANY et al., Appellees.

No. A–9902.

Supreme Court of Texas.

April 8, 1964.

Rehearing Denied May 6, 1964.

Warren G. Moore, Tyler, Herring & Werkenthin, Clark, Thomas, Harris, Denius & Winters, and Jas. H. Keahey, Austin, for appellant Stewart.

Small, Small & Craig, Austin, for appellants Triple S. Oil Co. and Wel-Rex Co.

Waggoner Carr, Atty. Gen., Austin, Linward Shivers, Joseph Trimble, Asst. Attys. Gen., for appellant Railroad Commission of Texas.

K. C. Minter, D. H. Gregg, Dillard Baker, Houston, for appellees Humble Oil & Refining Co.

Lloyd Armstrong, Clyde Willbern, Houston, for appellee Tidewater Oil Co.

Alfred O. Holl, Bartlesville, Okl., Powell, Rauhut, McGinnis, Reavley & Lochridge

and B. D. St. Clair and Frank Douglass, Austin, for appellee Cities Service Oil Co.

SMITH, Justice.

This suit was instituted by Humble Oil & Refining Company, Tidewater Oil Company and Cities Service Oil Company, hereafter referred to as plaintiffs, against Austin E. Stewart, hereafter referred to as Stewart, the Railroad Commission of Texas and the members thereof, hereafter referred to as the Commission. Triple S Oil Company and Wel-Rex Corporation intervened and aligned themselves with Stewart and the Commission.

Plaintiffs attacked the validity of two orders issued by the Commission on March 18, 1963. By these orders, the Commission approved the bottomhole locations of two wells which had been drilled by Stewart. Both bottomholes were deviated from their surface locations, but did not cross property lines. Plaintiffs contended before the trial court that the Commission orders approving these subsurface locations were arbitrary, capricious, not supported by substantial evidence, illegal and void.

The 53rd District Court of Travis County, Texas, sitting without the intervention of a jury, sustained plaintiffs' contentions, holding both of the Commission orders to be "arbitrary and unreasonable." The trial court judgment set aside the orders and permanently enjoined the Commission, its members, agents, servants and employees from issuing any allowable for the two wells in question. The judgment further enjoined Stewart, intervenors Triple S Oil Company and Wel-Rex Corporation, their agents or employees from producing the two wells.

From this judgment, Stewart, the intervenor defendants, and the Commission directly appealed to this court pursuant to Rule 499–a, Texas Rules Civil Procedure. It is important, in connection with a disposition of this cause, to note that neither of the Rule 37 permits issued to drill the wells in question contained a "straight-hole"

clause, and that both wells were drilled prior to the Commission's adoption of State-wide Rule 54, which regulates in detail the deviation of wells. The judgment of the District Court is reversed, and the permanent injunction dissolved.

The facts giving rise to the Commission's approval of the two bottomhole locations in question are these:

In October, 1935, Stewart Oil Company, a partnership comprised of W. E. Stewart and his son, Austin E. Stewart, applied to the Commission for a Rule 37 permit to drill a well on its 68.9-acre Emma Killingsworth lease in the East Texas Field, Gregg County, Texas. On the 28th day of October, 1935, after due notice and hearing, the Commission granted a permit to drill this well, hereafter referred to as Killingsworth No. 3. No party protested the granting of such permit. By July 27, 1939, Stewart had drilled and completed Killingsworth No. 3 at its stated surface location.

As to the second well in question, on November 6, 1940, Stewart Oil Company filed an application for a Rule 37 permit to drill the well on its 18.3-acre F. K. Lathrop lease in the East Texas Field. On the 13th day of March, 1941, after notice and hearing, the Commission granted a special permit to drill the well, hereafter referred to as Lathrop No. 6. No attack was made on the granting of this permit, and the well was drilled and completed in 1946. Both Killingsworth No. 3 and Lathrop No. 6 have produced from the dates of their completion up to the present.

In September, 1962, the Commission, after a preliminary survey being run by its Engineering Department, notified Stewart that according to its calculations, Killingsworth No. 3 was bottomed off its lease. Stewart was instructed by the Commission that a directional survey must be run on the well in order to retain it on producing status. In October, 1962, the Commission further required Stewart to run a directional survey on Lathrop No. 6. Directional sur-

veys were run by Sperry-Sun Well Surveying Company on the two wells, which surveys showed the bottomhole location of Killingsworth No. 3 to be deviated approximately 510 feet from its surface location, and the bottomhole location of Lathrop No. 6 to be deviated some 305 feet. Although deviated, neither well bores crossed property lines. The Killingsworth No. 3 was bottomed some 80 feet from the nearest lease line, and the Lathrop No. 6 approximately 250 feet.

In November, 1962, after discovery of these deviations, Stewart applied to the Commission for an order approving the bottomhole locations of Killingsworth No. 3 and Lathrop No. 6 as drilled. After due notice and hearing, the Commission issued its orders of March 18, 1963, approving these locations. It is these two orders which the plaintiffs, owners and operators of leases in the East Texas Field, attacked in the trial court, and which the trial court set aside as being "arbitrary and unreasonable."

■ All parties to this suit recognize that the question as to the proper location of a well is one vested peculiarly in the Commission as an administrative body, and one which cannot be exercised by the courts. See Railroad Commission v. Magnolia Petroleum Co., Tex.Civ.App., 125 S.W.2d 398, wr. ref'd. (1939); Railroad Commission of Texas v. Lamb, Tex.Civ.App., 81 S.W.2d 161, no wr. hist. (1935). In Railroad Commission v. Magnolia Petroleum Co., supra, a case which dealt with a variance as to a surface location, the District Court entered a judgment setting aside a Rule 37 permit issued by the Commission, and enjoined production from the well. The evidence showed that the well in question had been located on the surface some 49 feet south of the location established by the Commission in the permit.

In affirming that part of the trial court judgment which enjoined production from the well, the Court of Civil Appeals held that drilling 49 feet south of the stated surface location did not constitute "substantial compliance" with the Commission's original Rule 37 permit. However, the court recognized the right of the Commission to approve the surface variance and held that the persons who drilled the well could apply to the Commission for an order changing the location of the well authorized under the permit to that of the actually drilled well.

In its post-submission brief, plaintiffs concede that the Commission had the authority to approve the *subsurface* locations of Stewart's wells just as the Commission in the Magnolia case could approve the surface location of the well drilled. However, plaintiffs argue that before the Commission could so approve these bottomhole locations "there must be a showing by the operator that the 'wrong' or 'shifted' location is necessary to prevent confiscation or waste, the same as in any Rule 37 exception, *or* that the operator even at the 'wrong' or 'shifted' location was in substantial compliance with the Commission's original order." The basis of plaintiffs' argument is that Stewart presented no substantial evidence to show either of these requisites.

Both Stewart and the Commission contend that this is not a "run-of-the-mill" Rule 37 exception case, and that the question as to waste or confiscation has no bearing on the issues to be decided. In substance, both argue that the Commission had no legal right under its own rules to issue permits for the wells involved except on a finding that they were necessary to prevent confiscation. Stewart and the Commission say that such a finding was made over twenty years ago, when the original permits were granted, and therefore whether the Killingsworth No. 3 and Lathrop No. 6 are necessary for that purpose is not open to question at this time. Stewart contends he did not raise any issue as to confiscation since he was only seeking approval of the manner in which he had drilled Killingsworth No. 3 and Lathrop No. 6.

Stewart next argues, and the Commission agrees, that the Commission properly approves the bottomhole locations of Killingsworth No. 3 and Lathrop No. 6 because there is substantial evidence to support the Commission's implied finding that the locations of the wells reasonably comply with the Commission's original Rule 37 permits issued in 1935 and 1941.

■■■ Thus, the basic issue for this court to decide is whether or not there is substantial evidence to support the Commission's implied finding that the bottomhole locations of Killingsworth No. 3 and Lathrop No. 6 reasonably comply with the Commission's original permits issued for said wells. In determining this issue, it must be emphasized that the courts have consistently recognized that the Commission must be given discretion in administering the oil and gas statutes. See Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W. 2d 73 (1939). This court will not undertake to prescribe any rule or standard to guide the Commission in performing its duties, except that its actions must be legal, reasonable and not arbitrary. See Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393 (1935). Our function is to determine the validity of the Commission's order, and not to decide whether on like testimony we would have made a similar or contrary ruling. See Railroad Commission v. Lamb, supra; Rabbit Creek Oil Co. v. Shell Petroleum Corp., Tex.Civ.App., 66 S.W.2d 737, (1933).

The trial court found that the deviations of Killingsworth No. 3 and Lathrop No. 6 were intentional. Plaintiffs argue that this finding of intent goes to the question of whether or not the bottomhole locations of these two wells reasonably comply with the Rule 37 permits granted in 1935 and 1941. It is plaintiffs' position that, as a matter of law, an intentionally deviated well does not fulfill the test of reasonable compliance. Thus, plaintiffs conclude that Stewart had the burden of proving that the bottomhole

locations were necessary to prevent waste or confiscation. We do not agree.

■■ To adopt plaintiffs' position would necessarily mean that an operator who *intentionally* deviates his well some 5 feet from its surface location can never have the Commission approve his deviated position, while an operator who unintentionally deviates some 10 feet can apply for Commission approval. Logic negates such a result. Whether Stewart has intentionally deviated or not, any alleged "harm" resulting to plaintiffs is the same. In deciding whether an operator in Stewart's position has reasonably complied with the terms of his permit, the Commission's decision should not be controlled by the question of intent. To hold otherwise would be contrary to the long-recognized principle that when the subject of administration is so vast, complex and complicated, an administrative agency should not be placed in an absolute straight jacket. See Gulf Land Co. v. Atlantic Refining Co., supra.

Plaintiffs rely on the cases of Railroad Commission v. Magnolia Petroleum Co., supra; Gulf Oil Corp. v. York, wr. dism., judg. corr., Tex.Civ.App., 134 S.W.2d 502, and Loeffler v. King, Tex.Civ.App., 228 S.W.2d 201; rev'd. on other grounds 149 Tex. 626, 236 S.W.2d 772, as authority for their position that the subsurface deviations of Killingsworth No. 3 and Lathrop No. 6 are unreasonable as a matter of law. These cases do not support plaintiffs' contention.

Each of the above cited cases dealt with the problem of surface variances. In the Magnolia Petroleum and Gulf Oil cases, it was held that the surface variance location of the wells did not comply with the permits issued to drill the wells. Plaintiffs contend that Stewart's subsurface deviations are as much a failure to reasonably comply with the original Rule 37 permits as were the surface deviations in the above cited cases.

The difficulty with plaintiffs' argument is that in the present case Stewart, pursuant to the procedure set out in the Magnolia

Petroleum case, has applied to the Commission for orders approving the bottomhole locations. This being so, the only question is whether there is substantial evidence to support the Commission's implied finding of "reasonable compliance."

### Tests of Reasonableness

Plaintiffs next argue that the Commission has failed to follow its own test as to what constitutes "reasonable compliance." In order to understand this contention, we shall briefly set out certain Commission actions.

The Commission adopted state-wide Rule 54, a detailed Rule regulating the deviation of wells, on March 7, 1949. By its terms it was not applicable to wells, such as Killingsworth No. 3 and Lathrop No. 6, drilled before its adoption. See Harrington v. Railroad Commission of Texas et al., Tex., 375 S.W.2d 892, (1964). At the beginning of the 1962 slant-hole investigation the Commission took into account the problem of wells, such as those in question, which had been drilled prior to Rule 54 which were not bottomed under their surface locations, but still bottomed under the confines of their own lease. In its Memorandum to Rule 37 Department in Re: Rule 37 Re-Applications on Deviated Wells, January 15, 1963, the Commission stated:

"The Commission has carefully considered several re-applications for permits to allow continued production from wells found to be deviated in excess of a reasonable tolerance, but have been shown to be bottomed on the lease where permitted.

"The Commission concluded that wells so deviated, whether intentionally or otherwise, prior to the adoption of Statewide Rule 54, which was issued effective April 1, 1949, were the principle cause for the promulgation of said Rule 54, and were at the time such rule was adopted, accepted as legally existing wells, which remained unaffected by such rule because it was prospective in nature only.

"The Commission reiterates such conclusion and by this memorandum directs the Rule 37 Department to develop the record in each such re-application for permit for a deviated well so that the Commission can determine the condition for each such well. The examiner will adduce the following sworn testimony and authenticated data:

"1. That such well was deviated before the adoption of Rule 54.

(a) Proof of completion of the well prior to that date and its subsequent producing status is not adequate proof of deviation.

"2. That such well was completed on the lease where the surface location was permitted.

(a) Such bottomhole location must be proven by the submission of an acceptable authenticated directional survey.

"3. That such bottomhole location is one that either is not in direct violation of a condition or limitation placed in the Permit to Drill, or is not in violation of a specific Commission order.

(a) Example: Denial order for a Rule 37 application for a comparable location.

"4. That the present operator of such well or his predecessor has not filed either a false inclination or a false directional survey with the Commission.

"A well that is either (1) bottomed off the lease or (2) deviated after the adoption of Rule 54 or (3) drilled in direct violation of a specific condition or limitation placed in the Rule 37 permit or (4) is in violation of a specific Commission order, is an illegal well and it shall not be permitted, and such

well where permit is refused shall not be considered a replaceable well under Commission replacement well regulation.

"The foregoing instructions do not preclude an operator from applying for a location as a reasonable location under the rules and regulations now applicable."

This memorandum clearly shows the Commission's position that a well that was deviated, but not bottomed out from under its own lease, should be classified as a legal well and be allowed to produce until a hearing could be had to determine whether the new bottomhole location was a reasonable one.

Plaintiffs contend that in approving the bottomhole location of Killingsworth No. 3 and Lathrop No. 6, the Commission failed to follow one of its tests of "reasonableness" as set out in the memorandum. In particular, plaintiffs point out the paragraph of the memorandum which provides as follows:

"3.  That such bottomhole location is one that either is not in direct violation of a condition or limitation placed in the Permit to Drill, or is not in violation of a specific Commission order.

(a) Example: Denial order for a Rule 37 application for a comparable location."

Plaintiffs argue that since both Killingsworth No. 3 and Lathrop No. 6 were deviated and bottomed beneath *comparable locations* which had been previously denied Rule 37 permits, the Commission, under this test of "reasonableness," should not have approved these two bottomhole locations.

■  The burden is upon the plaintiffs to show that there is no substantial evidence to support the Commission's implied finding that there had been no prior denials of permits to drill at surface locations comparable to subsurface locations where Killingsworth

No. 3 and Lathrop No. 6 are bottomed. Plaintiffs introduced before the Commission an Examiner's Memorandum and Commission order dated May 6, 1939, which denied Stewart's application to move Killingsworth No. 3 some 200 feet west of the stated surface location in the original permit granted in 1935. Plaintiffs further introduced Stewart's application and a Commission order of May 6, 1939, denying the application to drill proposed Lathrop No. 5 and No. 6 wells. As seen above, the Commission in 1940, did grant a permit to drill Lathrop No. 6.

■  The above evidence does show that certain applications to drill were denied, but the Commission impliedly found that such denied locations were not comparable to the present bottomhole locations of Killingsworth No. 3 and Lathrop No. 6. The record shows that one of the denied locations is over 340 feet from the bottomhole of Killingsworth No. 3 and the other denied location is some 220 feet from the bottomhole of Lathrop No. 6. We cannot say plaintiffs carried their burden of proving there is no substantial evidence on which the Commission could treat these denied locations as *not* comparable to the bottomhole locations of the wells in question.

■■  Stewart argues there is substantial evidence on which the Commission could base a finding that the bottomholes of Stewart No. 6 and Killingsworth No. 3 "reasonably comply" with their original permits.

The record discloses that neither of the permits which the Commission issued in 1935 and 1941 for the drilling of the wells in question contains a "straight-hole" clause. In fact, it was not until 1946 that the Commission adopted a policy of inserting such clauses in specific Rule 37 permits where the offset operators requested it. Both Killingsworth No. 3 and Lathrop No. 6 were drilled and completed prior to the Commission's adoption of Statewide Rule 54, a detailed Rule regulating the deviation of wells. By its terms, it is not applicable

to the wells in question. See Harrington v. Railroad Commission of Texas et al., supra. The Commission further considered the fact that neither well in question trespasses onto another's land. There was also evidence before the Commission that the bottomhole locations of the two wells do not allow Stewart to produce any more oil than could be produced if the wells had not been deviated. In this regard, Mr. Douglas, a consultant petroleum engineer from Longview, testified in regard to the subsurface location of Killingsworth No. 3 as follows:

"Q. Would the bottomhole location of the well No. 3 do the same job as if it were drilled straight down?

"A. The bottomhole location, which is at the northwest corner of the Killingsworth lease, is not as good a location as if the well were drilled straight down at its present surface location.

      *     *     *     *     *     *

"Q. One other question, Mr. Douglas. State whether or not in your opinion Austin E. Stewart has received any more oil from this well # 3 to date and during the time of its production than he would have had it been drilled straight down under the—

"A. No, sir. In fact, as I stated before, there is a good possibility that he received a lot less oil because the well has been, I understand, a top allowable since it was drilled."

In regard to Lathrop No. 6 Mr. Douglas stated:

"Q. Now, that [Lathrop] # 6 well, would it do the same job that it is doing now if it was drilled straight down?

"A. The # 6 well—put it this way: The present bottomhole location of the # 6 well, I feel, is not as good as a bottomhole location directly under the surface location, for the reason stated in the Killingsworth; the water is moving from west to east and naturally it is going to reach the present bottomhole location before it would reach a surface location straight down. And also—this will be brought out on another exhibit—if the well was drilled straight down at the present surface location, there is a good indication that this well could be marginal today. And if it was marginal, producing on a calendar basis, that it naturally would produce more oil—be allowed to produce more oil than a top allowable well.

   *     *     *     *     *     *

"A. I will put it this way: The present bottomhole location will not produce any more oil than a location drilled straight down. Does that answer your question?

"Q. Yes. In your opinion, have either of these leases, or will they in the future, recover any more oil by virtue of the fact that the wells are deviated up into one side or the other than they would have produced if the holes had been straight down?

"A. I would say that they would recover no more oil, that is true. * * *"

The Commission could reasonably find from this testimony that Stewart had gained no advantage over the plaintiffs by reason of his wells being deviated. As noted at the outset, this court's function is to determine the validity of the Commission's order, and not to decide whether on like testimony we would have made a similar or contrary holding. In the present case the Commission, after due notice and hearing, issued its orders approving the bottomhole locations of Killingsworth No. 3 and Lathrop

No. 6. If there is any legal basis for these orders, they must be upheld. See Harrington v. Railroad Commission of Texas et al., supra; Texas Employment Commission v. Hays, Tex., 360 S.W.2d 525, (1962). Stewart and the Commission justify the orders on the legal basis that the bottomhole locations of the wells in question reasonably comply with the original permits granted in 1935 and 1941. From a review of the entire record, this court cannot say that there is not substantial evidence to support such a finding.

The judgment of the District Court is reversed, and the permanent injunction dissolved.

NORVELL, J., dissenting.

WALKER, J., not sitting.