Harry M. HARRINGTON, Jr., et al.,
Appellants,

v.

The STATE of Texas, Appellee.

No. 11234.

Court of Civil Appeals of Texas.

Austin.

Nov. 18, 1964.

Rehearing Denied Dec. 9, 1964.

Second Motion for Rehearing Denied
Jan. 6, 1965.

Gordon Wellborn, Houston, Phenix, Keeling & Wilder, Henderson, Harrington & Harrington, Longview, for appellants.

Waggoner Carr, Atty. Gen., Cecil C. Rotsch, Roger B. Tyler, Kerns B. Taylor, Robert C. Flowers, Robert O. Smith, Asst. Attys. Gen., Austin, for appellee.

HUGHES, Justice.

The State of Texas sued H. M. Harrington, Jr., Charles W. Lutes, Reid H. Allgood, John W. Baton, appellants, and Douglas Godfrey, individually and as members of Hal Company, a partnership, for penalties as authorized by Art. 6036, Vernon's Ann. Tex.Civ.St.[1] for the violation of certain statutes and rules and regulations of the Railroad Commission.

Following a trial by jury, judgments in varying amounts were rendered against all defendants except Douglas Godfrey as to whom a take nothing judgment was rendered.

Appellants' first point is that the trial court erred in denying them the right to require the State of Texas to answer interrogatories pursuant to the provisions of Rule 168, Texas Rules of Civil Procedure. This rule provides, in part:

"At any time after a party has made appearance in the cause, or time therefor has elapsed, any other party may serve upon such party written interrogatories to be answered by the party served or, if the party served is a public or private corporation or a partnership or association, by any officer

1. "Art. 6036. Penalty

"In addition to being subject to any forfeiture that may be provided for by law and to any penalty that may be imposed by the Commission for contempt for the violation of its rules, regulations, or orders, any person violating any of the provisions of this Act or of Title 102, Revised Civil Statutes of Texas, 1925, as amended, or violating any rule, regulation, or order of the Commission promulgated thereunder, shall be subject to a penalty of not more than One Thousand Dollars ($1000) for each and every day of such violation, and for each and every act of such violation, to be recovered in any Court of competent jurisdiction in Travis County, or in the county of the residence of the defendant or, if there be more than one defendant, in the county of the residence of any of them, or in the county in which the violation

is alleged to have occurred, such suit by direction of the Commission to be instituted and conducted in the name of the State of Texas by the Attorney General or by the county or district attorney where such suit is brought. The recovery or payment of any such penalty shall not authorize the violation of any provision of this Act, or Title 102, Revised Civil Statutes of Texas, 1925, as amended, or of any rule, regulation, or order of the Commission promulgated thereunder.

"Any person aiding or abetting any other person in the violation of this Act, or of Title 102, Revised Civil Statutes of Texas, 1925, as amended, or of any rule, regulation, or order of the Commission promulgated thereunder, shall be subject to the same penalties as are prescribed herein for violation thereof by any such other person."

or agent, who shall furnish such information as is available to the party. The interrogatories shall be answered separately and fully in writing under oath. The answers shall be signed by the person making them or by the attorney for the party. * * *

"Interrogatories may relate to any matters which can be inquired into under Rule 186a, but the answers, subject to any objections as to admissibility, may be used only against the party answering the interrogatories."

 It is our opinion that this rule is not applicable to the State of Texas. We know of no State official or agent who is authorized to answer interrogatories for the State. It is the duty of the Attorney General, under Art. 6036, to institute and conduct this suit, but he is prohibited by Art. 4411, V.T.C.S., from making any admission, agreement or waiver in a suit to which the State is a party which shall prejudice the rights of the State. The powers of the Attorney General, thus circumscribed, are not to be enlarged by the courts. State v. Reagan County Purchasing Co., 186 S.W.2d 128, El Paso Civ.App., writ ref., w. o. m.

Appellants cite authorities to the effect that Federal Civ. Rule 33 of similar import to Rule 168 has been held applicable to the National Government. Without attempting to analyze the powers of the Attorney General of the United States, we note that he has broad powers of compromising claims against the United States. Title 28, § 2414, U.S.C.A. The Texas Attorney General has no comparable authority. Unless the Attorney General is authorized to answer interrogatories for the State we know of no other officer who is so authorized and appellants do not suggest any. It would be futile for the Attorney General to answer interrogatories for

the State when his answers could not prejudice the rights of the State. Point One is overruled.

Point Two is that the trial court erred in permitting the State to file a "trial amendment" an hour before trial time and in denying their motion for continuance based on their resultant surprise.

That portion of the amended pleading[2] to which appellants objected by filing a motion to strike was the allegation that, "The Defendants violated Railroad Commission Statewide Rule 37, and also Hawkins Field Rule 1," whereas the previous pleading alleged that, "The Defendants violated Railroad Commission Statewide Rule 37, and also East Texas Field Rule 1, * *."

We quote from appellants' argument under this point:

"The significance of this late change in pleading is readily apparent. The well in question is located in the Hawkins Field and is not located in the East Texas Field. The Defendants obviously, therefore, had not and could not have violated any East Texas Field Rule, because such Field Rules are not and could not be applicable to a well in the Hawkins Field. The Defendants had come prepared to defend the case based on the Plaintiff's case as it was then pleaded, and were forced without time for preparation into a case predicated on an entirely different cause of action. Strict pleading is required in civil penalty suits."

The only significant difference between East Texas Rule 1 and Hawkins Field Rule 1, besides spacing variation, is the provision in the East Texas Rule that wells drilled in violation of a permit issued under it "shall be plugged," whereas the Hawkins Field Rule 1 does not contain this provision.

---

2. This amendment was filed before trial. It was not a "trial amendment." Rule 66, T.R.C.P. It was not a complete pleading. It was not an amended petition. Rules 62–65, T.R.C.P.

Statewide Rule 37 with the violation of which appellants were charged in all prior pleadings contains the provision that a well drilled in violation of a permit granted under it "shall be plugged."

Under these circumstances, we find no element of justifiable surprise by appellants which was occasioned by the late filed amended pleading. They certainly were not surprised when informed that their well was in the Hawkins Field and not in the East Texas field. They were at all times charged with violation of a Commission Rule which required the plugging of the well. The Hawkins Field Rule, on its face, is less onerous than the East Texas Field Rule, because it does not expressly require the plugging of a well drilled in violation of a permit issued under it.

It is our opinion that the trial court did not err in refusing appellants' motion for a continuance. There was error in the trial court's action in permitting an incomplete pleading to be filed as an amended petition. This error, in our opinion, was harmless under Rule 434, T.R.C.P. Point Two is overruled.

Points Three and Four, jointly briefed, are that the court erred in holding that Rule 37 of the Commission applies to a well in the Hawkins Field which is subject to Hawkins Field Rule 1, and that the court erred in holding that Rule 37 applied to a deviated well rather than Rule 54.

It is our opinion that the court did not err in holding that Rule 37 is of statewide application except as modified by special rules for individual fields such as the Hawkins Field.

Statewide Rule 37 is a spacing rule with several provisions. Section (a) provides spacing distances, application and hearing on exceptions. Section (b) provides for a hearing on exceptions duplicating parts of Section (a). Section (c) provides for the filing of a plat. Sections (d), (e) and (f) read as follows, to-wit:

"Section (d). In the interest of protecting life and for the purpose of preventing waste and preventing the confiscation of property, the Commission reserves the right in particular oil and gas fields to enter special orders increasing or decreasing the minimum distances provided by this rule.

"Section (e). No well drilled in violation of this rule without special permit obtained, issued or granted in the manner prescribed in said rule, and no well drilled under such special permit or on the Commission's own order which does not conform in all respects to the terms of such permit shall be permitted to produce either oil or gas, and any such well so drilled in violation of said rule, or on the Commission's own order shall be plugged.

"Section (f). This rule shall in no wise rescind, abrogate or modify the provisions of special orders applicable to the spacing of wells in particular fields requiring minimum spacing distances either greater or smaller than provided herein."

The Hawkins Field Rule 1 contains this provision:

"THEREFORE, IT IS ORDERED By the Railroad Commission of Texas that the following rules and regulations be and the same are hereby adopted effective this date to be maintained in effect, in addition to the general conservation rules and regulations governing said field, for this field or extensions thereof until further ordered by the commission:"

This rule contains spacing regulations differing from those contained in Rule 37. It provides that the general order of the Commission as to subdivision of property shall apply, an order which is not a part of Rule 37. The Hawkins Field Rule contains numerous technical provisions. It does not contain a provision that a well

drilled in violation of a permit issued under it shall be plugged.

■ When Section (f) of Rule 37 and the copied portion of the Hawkins Rule 1 are considered, it is evident that the two rules are to be read and construed together, and that the special field rules have priority over Rule 37 only to the extent of conflicting provisions.

■ It is a general rule of statutory construction that statutes in pari materia should be read and construed together as though they were parts of one and the same law. 53 Tex.Jur.2d, Statutes, Sec. 186. This rule of statutory construction is applicable to rules of the Commission which have the force of statutes.

■ The plain express intent of the Commission is to prohibit the production of oil or gas from a well drilled in violation of its rules. We cannot ascribe to the Commission an intent, derived from its failure to include a plugging clause in Hawkins Rule 1, to discriminate in favor of illegal wells in the Hawkins Field and to allow them to produce and go unplugged. In our opinion, there was no need to incorporate a plugging clause in Hawkins Rule 1 for the reason that it was in Rule 37, a rule of Statewide application and expressly brought forward in the Hawkins Rule 1. There being no conflict between the plugging requirement of Rule 37 and any provision of Hawkins Rule 1, we hold that Rule 37, in such respect, is fully operative in the Hawkins Field.

Rule 54 of the Commission reads:

"(a) The term 'directionally deviate' as used in this order shall mean the deviation of a bore hole from the vertical or from its normal course in an intended predetermined direction or course with respect to the points of the compass and shall not include deviations made for the purpose of:

"(1) Straightening a hole which has become crooked in a normal course of drilling.

"(2) Deviating a hole at random 'without regard to compass direction' in an attempt to side-track a portion of the hole on account of mechanical difficulty in drilling.

"(b) Nothing in these rules shall be construed to permit the drilling of any well in such manner that it crosses property lines, except in .cases where special permission has been granted by the Commission as the result of a hearing on such matter."

■ Appellants contend that Rule 37 deals only with surface locations of wells and not with deviation in drilling or the location of the bottom hole, but that these matters are controlled and regulated solely by Rule 54 which requires an intent to deviate in order to constitute a violation of the rule.

A violation of Rule 54 was pleaded by the State, however, as we understand the State, it does not contend that a violation of Sec. (a) has been established because there is no finding of intent. The State does assert that a violation of Sec. (b) of Rule 54 has been established by reason of the jury finding that appellants' well was not bottomed under their lease.

We cannot agree with appellants that Rule 37 applies only to surface location of wells.

A note in 42 Tex.Law Rev., p. 922 by Mr. Thomas L. Healey in reviewing Harrington v. Railroad Comm., 375 S.W.2d 892 (Tex.), gives the common sense answer to appellants wherein it is stated, " * * * the only reason for the surface location is to specify the bottom hole location."

Appellants cite the testimony of Mr. Joseph Trimble given in a case then pending in our Supreme Court when Mr. Trimble was representing the Commission to the

effect that the Commission considered a Rule 37 Permit to relate to the surface location of the well and, prior to the adoption of Rule 54, that "the Commission is not concerned where the well is bottomed if you don't cross a lease line."

The testimony referred to is not in evidence in this case and we have no authority to consider it. Also, the Commission herein repudiates such testimony of Mr. Trimble.

Appellants also refer to the opinion in Harrington, supra, as holding " * * * by inference that Rule 37 covers the surface location only. * * *" Appellants do not analyze this case and point out the basis for their statement. We have carefully read this case and the only language which we find which might be susceptible to appellants' construction of the opinion is the statement, "Drilling at an established surface location may be a condition to the right to drill, but drilling a straight hole obviously is not." This statement has reference to the Court's discussion of Rule 54 which the Court states " * * * expressly recognizes the right of an operator to correct an excessive deviation. * * *." This, to us, simply means that drilling at the wrong surface location is prohibited ab initio and can never be corrected, whereas crooked drilling can only be corrected after it is committed. The logic of this is unanswerable. It is our opinion that Harrington does not hold by inference, or otherwise, that Rule 37 does not embrace within its terms a whole well when it refers, repeatedly, to a "well." A surface location is a mere point on the landscape. A "well" must have dimensions. It must have a top and a bottom. Rule 37 regulates the spacing and drilling of "wells." The Commission does not regulate the use of the surface except as incidental to its primary function in regulating the production of oil and gas which is usually found below the

surface and at the bottom of the well.[3] Points Three and Four are overruled.

Point Five is that the Court erred in rendering judgment for 3,650 days for violation of Rule 37 on the Court's finding that appellants' well had not been plugged because the pleadings do not seek a penalty for failure to plug.

The pleadings of the State do not specifically allege that appellants failed to plug the well. They do allege, and we quote:

"This suit is being brought for civil penalties because of violations by the Defendants of the laws of the State of Texas, towit, the provisions of House Bill 782, Acts of 1935, 44th Legislature, p. 180, Ch. 76, and of Title 102, Revised Civil Statutes of Texas, 1925, as amended, and particularly Article 6036, V.A.C.S., thereof, and of the rules, regulations and orders of the Railroad Commission of Texas, and other penalties, as provided by the laws of the State of Texas, and as hereinafter alleged. * * *

"By virtue of drilling said crooked oil Well No. 1, and by virtue of producing oil by means of said crooked well which resulted in oil being wrongfully taken from other people, and by virtue of filing a false log and well record, all as above alleged, the Defendants were guilty of violating the laws of the State of Texas and the rules of the Railroad Commission of Texas, thereby being liable for the penalties prescribed by law, and hereinafter stated, said violations being as follows:

"1. The Defendants violated Railroad Commission State Wide Rule 37, and also East Texas Field Rule 1 (effective July 13, 1939), [Hawkins Field Rule 1] each of which provide that as to oil wells drilled as

---

3. In Stewart v. Humble Oil & Refining Company, 377 S.W.2d 830, Tex.Sup., a Rule 37 case, Humble et al. "[C]oncede that the Commission had the authority to approve the *subsurface* locations of Stewart's wells."

close to property lines as this well was drilled such well shall be drilled only at the location authorized by the permit of the Railroad Commission for that particular well; and in this case the Defendants were authorized to drill said well 234 feet north of the south property line and 234 feet east of the west property line, but the Defendants directionally drilled it closer to the west property line, and actually slanted it across the lease line and into the lands of others; and the Defendants illegally operated said well for a period of over 3,650 days.

"2. The Defendants violated Railroad Commission State Wide Rule 54 (being order No. 20–14, 181, effective April 1, 1949), which then provided that no well should be directionally deviated in an intended predetermined direction from its vertical or from its normal course before the operator shall have secured from the Commission a permit for such directional deviation; and in this case the Defendants directionally deviated said well in violation of said rule, and slanted the same into the lands of others, without a permit from the Commission to deviate the well."

It is undisputed that the well in suit was operated and produced oil monthly for the ten year period on which the assessed penalties were based.

It is our opinion that the pleadings, in this respect, were factually sufficient to allege the maintenance of the well in an unplugged state for the ten year period. A plugged well cannot operate. Neither can a plugged well produce oil. It was alleged that the well was operated and produced oil for ten years. A further allegation that the well was unplugged during that period would not have added any fact not pleaded by necessary implication.

Rule 45, T.R.C.P. requires all pleadings to be construed so as to do substantial justice. Our construction of the State's pleadings accords with that Rule. Point Five is overruled.[4]

Points Six and Seven, jointly briefed, are that the Court erred in rendering judgment based on the operation of the well for 3,650 days because there is no proof to such effect (Point Six), and, similarly, the Court erred in rendering judgment based on a finding that the well was drilled sixteen days because there was no proof to such effect.

As to the sixteen days drilling, a report filed with the Railroad Commission by J. W. Baton for the Hal Company and sworn to before H. M. Harrington, Jr., Notary Public in Gregg County, states that the well drilling commenced April 6, 1952, and was completed April 21, 1952. This completion date is supported by another report filed with the Commission by Mr. Baton for the Hal Company, which is witnessed by appellant Charles W. Lutes.

 There is other evidence in the record to sustain a finding that 16 days were spent in drilling this well, but we consider the evidence stated is sufficient to demonstrate that there was some evidence to sustain it.

The evidence relied on to support the finding that the well was operated 3,650 days consists of reports made to the Commission by or on behalf of appellants regarding production from the well. They show that the well produced its monthly allowable commencing with May, 1952, to and including June, 1962. During this period the well produced 284,133 barrels of oil.

Mr. Roy D. Payne, Director of field operations for the Commission, testified as follows:

"Q Now, then Mr. Payne, isn't it true that the Hawkins Field is subject

---

4. In view of our reversal as to this phase of the case, this question should not recur.

to what we know as shutdown days in the State of Texas under its oil and gas regulations?

"A Yes, sir.

"Q So that if you have an eight-day schedule for a month, that means that a well may produce on eight out of the thirty or thirty-one days of the month; is that correct?

"A It can produce an allowable for eight days. It can produce the allowable over the entire period of the month on a calendar day basis.

"Q In other words, a well that—let's take this Number 4 Well,—or let's take the Number 9 Well; that is the first one we discussed. Number 9 Well, that will pump seventy-five barrels a day as of the last of June of '62; you will allow it to make its 187 barrels a day by pumping more than eight days?

"A Yes, sir.

"Q That is Commission policy, is it?

"A Yes, sir. * * *

"Q Now, would you explain once again what it means to have an allowable that—suppose a well were on an eight-day allowable; does that mean it can produce thirty days a month as long as it only produces eight day's production?

"A Yes, sir.

"Q So that you could take a small amount of oil each day and produce the eight-day allowable?

"A Yes, sir.

"Q It doesn't mean it just produces eight days and then it doesn't produce on the others?

"A ˙ No, sir."

This evidence, in our opinion, establishes only the possibility that the well produced oil each of the 3,650 days for which penalties were assessed. It is no more than a scintilla. We believe, if necessary, that we would take notice, as a matter of common knowledge, that oil wells, other than marginal wells, do not as a rule produce oil every day in the month to make the allowed monthly production.

■■■ The State suggests that since the evidence shows that the well was in an operative condition that this is the equivalent of a showing that it was continuously operated by the production of oil.

The State also suggests it having shown that the well was completed as a producer, the presumption should be indulged that production was continuous thereafter until otherwise shown; also, that this information being peculiarly within the knowledge of appellants that the burden was on them to show the days the well actually produced.

The appellants in this case, other than Baton, answered to the merits by general denial only, except that they, not including Baton, specially denied existence of the alleged partnership. Other than the denial of the partnership, we are not informed of any defense which appellants were required specially to plead. The Statute, Art. 6036, contains no exceptions which, conceivably, could put the burden of pleading and proof on appellants.

■■■ Without answering, seriatim, these suggestions by the State, we hold that the rules advocated are not applicable in this suit for penalties where the law requires strictness in pleading and proof. 43 Tex. Jur., Sec. 720, p. 697, Penalties, Sec. 15, p. 15, 45 Tex.Jur.2d.

■■■ Inferences and intendments will not be employed to aid a pleading in a penalty suit. Penalties, 45 Tex.Jur.2d, Sec. 14, p. 13. By the same token, we do not

believe that the presumptions sought to be invoked here are available to the State. Penalty suits are analogous to criminal proceedings and the State, in our opinion, should shoulder the burden of establishing its case unaided by presumptions applicable in ordinary civil actions. See Lee v. Robinson, 282 S.W.2d 397, Texarkana Civ.App., writ dism., where it is held that neither the capacity of a well to produce oil or that its allowable had been set by the Commission raises a presumption that it produced oil.

There is also in the State's brief the statement that, "There was no evidence introduced upon which a jury finding could rest that the well failed to produce on any given day or for any number of days. Consequently, there was no fact issue to go to the jury on the number of days of actual production."

■ This, in our opinion, is a misconception of the law. The burden was on the State to prove the number of days the well produced if it intended to base a judgment on the number of producing days. Appellants had no burden to prove the number of nonproducing days.

■ As we understand the record, it conclusively establishes the minimum number of days the well produced oil over the ten year period. The record shows the daily potential of the well and its monthly production. By dividing this daily potential into the total production for the month, the minimum number of days the well operated is mathematically ascertained. We sustain appellants' Point Six.

Points Eight and Nine, jointly briefed, are that the Court erred in admitting in evidence reports and exhibits based on a gyroscopic survey of the well in suit over objections that the instrument employed to make such survey had not been proved reliable as the law requires.

All parties cite as correct and applicable the rule stated in Wigmore, The Science of Judicial Proof, p. 450, as quoted in Wilson v. State, 168 Tex.Cr.R. 439, 328 S.W.2d 311, as follows:

"'* * * since the additions made possible to our unaided senses are due to the use of instruments constructed on knowledge of scientific laws, it is plain that the correctness of the data thus obtainable must depend upon the correctness of the instrument in construction and the ability of the technical witness to use it. Hence, the following three fundamental propositions apply to testimony based on the use of all such instruments:

"'A. The type of apparatus purporting to be constructed on scientific principles must be accepted as dependable for the proposed purpose by the profession concerned in that branch of science or its related art. This can be evidenced by qualified expert testimony; or, if notorious, it will be judicially noticed by the judge without evidence.

"'B. The particular apparatus used by the witness must be one constructed according to an accepted type and must be in good condition for accurate work. This may be evidenced by a qualified expert.

"'C. The witness using the apparatus as the source of his testimony must be one qualified for its use by training and experience.'"

■ The instrument used to survey appellants' well is known as a Sperry-Sun gyroscopic directional survey instrument. The witness who testified regarding this instrument was Mr. H. Grady Bell, an employe of Sperry-Sun Well Surveying Company. He was a mechanical engineer with five years of college education in Arlington State College and A & M University. He had worked for this company about ten years. He had made over five hundred well surveys, but not all with this instrument. Mr. Bell explained in great detail the operation of this instrument and the manner in which a well is surveyed. Mr. Bell testified

that the instruments used in this survey were of a type accepted by engineers as dependable for the purpose of determining the inclination and direction in which the well hole travels under the surface.

Mr. Thomas H. Sellers, a senior bore hole surveyor with Sperry-Sun Well Surveying Company, with four years college education, East Texas Baptist College one year, three years at Texas A & M, who majored in electrical engineering, made the survey of appellants' well. He testified at length about the manner of making the survey and unequivocally stated that the instruments used by him were in proper order and functioned properly during the survey. The qualifications of Mr. Sellers were verified by Mr. Bell to whom we have previously referred.

The above testimony fully complies with the requisites stated in Wigmore, supra, for the admissibility of evidence obtained by the use of scientific instruments.

Appellants offered testimony to some mistakes which had been made in using the surveying instrument in question. These mistakes were quickly detected and corrected. They also cross-examined Mr. Bell regarding the length of time this surveying instrument had been in commercial use and Mr. Bell testified that it had been so used since June or July of 1962. The survey here was made in the latter part of July 1962. Mr. Bell further testified that the instrument used on this well was a "compact model of the gyro that has been used to survey wells since 1929." The instrument used appears to be an improved type of former models.

■■■■ The question of whether a proper predicate was laid for the admission of the results for this scientific survey was at least issuable. The ruling of the trial court must be sustained unless there appears to have been an abuse of discretion on his part. We find no such abuse. Points Eight and Nine are overruled.

Point Ten by appellants other than Baton is that the trial court erred in permitting the State to reopen the case after the jury returned its verdict and offer evidence as to the number of days on which this well was drilled and as to the number of days it produced oil, it being asserted that these matters were controversial.

Rule 270, T.R.C.P., authorizes the introduction of additional evidence at any time except that evidence on a controversial matter may not be received after the jury verdict.

All that the trial court permitted to be introduced after the verdict as regards the number of drilling days was an admission made by Mr. Harrington in deposition proceedings and the admission in evidence for all purposes certain exhibits which had been admitted for limited purposes. These exhibits are discussed under Point Five, supra. The admission of Mr. Harrington is consistent with these exhibits as to the time spent in drilling this well.

No issue was submitted to the jury inquiring as to the number of days on which this well was drilled. There was no evidence on the issue. The evidence admitted after the verdict did not create a controversial issue. It was undisputed and conclusive.

■■■■ We understand Rule 270 to refer to a controversial matter which has been or should be submitted to the jury. As to such matters additional evidence may not be received after the verdict. Such rule, however, does not, in our opinion, preclude the reception in evidence after verdict of matters about which there is and could be no controversy. The evidence as to drilling was not controverted nor was there any showing that it could be controverted. We hold that it was properly received after the verdict. Texas Employers' Ins. Association v. Elder, 155 Tex. 27, 282 S.W.2d 371.

■■■■ In our ruling under Point Six we have held that the number of days on which

this well produced oil or was operated has not been adequately established. The error complained of here as to the admissibility of evidence after the verdict on this subject is, if committed, harmless. Point Ten is overruled.

Point Eleven is that the trial court erred in not submitting separate issues regarding the culpability of each appellant as a person violating specified statutes and rules and orders of the Commission.

By its charge, the trial court inquired whether appellants' well was bottomed off its lease and, conditioned upon an affirmative finding to this issue, what penalty should be assessed for drilling and operating the well, with separate findings for each appellant.

While Art. 6036 states that any person aiding or abetting any other person in violation of such Act shall be subject to the same penalties as are prescribed for its violation by such other person there were no allegations in the State's petition that any appellant aided or abetted any person in the violation of the Act. All appellants were charged as principals.

Appellants seem to argue when they say, "Since the State's petition failed to charge who was claimed to be the principal and who was claimed to be the aider or abetter, the pleading was insufficient and requires this case to be reversed and rendered," that the Act requires that there be a person aiding and abetting another person in violating the Act before such other person can be charged with his own violation of it. Assuming, that this argument is germane to this point, we consider it to be completely untenable. The statute is not subject to this weird construction. Under it, there may or not be aiders or abettors. Point Eleven is overruled.

The Twelfth Point is that the trial court erred in refusing to enter judgment for

appellants because there was no evidence that appellants knowingly, intentionally or wilfully deviated the well in controversy.

This is, perhaps, the most vital question to be determined in this case. If scienter on the part of appellants is required in order to penalize them for drilling on oil well bottomed on their neighbor's land, then this case must be reversed in its entirety.

It is not without some difficulty that we have concluded that it was not incumbent upon the State to allege or prove that the well was knowingly deviated or drilled to bottom off the lease of appellants.

Our difficulty has been primarily due to expressions of the Courts in Hedgepeth v. Hamilton Warehouse Co., 104 Tex. 496, 140 S.W. 1084 and Whitfield v. Terrell Compress Co., 26 Tex.Civ.App. 235, 62 S.W. 116, writ ref. and to the provisions of Rule 54 of the Commission.

In Whitfield it is "said" [5] that "The act under consideration is highly penal in its character, and it is only for a willful disregard of the law that its penalties should be inflicted." This statement is copied, apparently with approval, in Hedgepeth. A cursory reading of these cases will convince the reader that such statement was not necessary to the decisions and that no holding to such effect was made in either case.

An examination of the legislative history of Article 6036 establishes to our satisfaction that the Legislature has deliberately negatived the requirement that knowledge on the part of the violator is essential to the infliction of penalties provided by it. The history of this article is set out in the notes to it in Vernon's Annotated Texas Civil Statutes and will not be detailed here. It is sufficient to state that prior to 1934 the predecessor of this article did not provide that knowledge or wilfullness was required in order to be subject to the penalties prescribed. In 1934 the statute was amended so as to require that one must "knowingly

---

5. See Penalties, 45 Tex.Jur.2d, p. 5 where this word is used in referring to the pertinent language in such cases.

and wilfully" violate its terms or "knowingly and wilfully" violate the terms of Commission rules, regulations or orders. The statute was last amended in 1935, and does not, by its terms, require that the violation be knowingly or wilfully committed in order that penalties be assessed.

"It will be presumed that the Legislature, in adopting the amendment, intended to make some change in the existing law, and therefore the courts will endeavor to give some effect to the amendment." American Surety Co. of N. Y. v. Axtell Co., 120 Tex. 166, 36 S.W.2d 715, quoting from earlier Texas cases.

■ The only effect which we can give to the amending act of 1935 is to eliminate the previous requirement that knowledge and wilfullness are constituent elements of the violations named and to hold, as we do, that such elements need not be alleged or proved in order to assess penalties specified by the present act.

■ The State cites, and we judicially know, that there are many statutes, civil and criminal, imposing penalties for the commission of acts where knowledge, wilfulness, intent or motive are not required by the statute and are not essential to conviction. Generally the acts so proscribed are those not inherently wrong or immoral. They are unlawful only because they are prohibited by law and are called malum prohibitum. There is no novelty in our construction of Art. 6036, 45 Tex.Jur.2d, Penal-

ties, Sec. 3, p. 4, 70 C.J.S. Penalties § 6 a, p. 395.

Rule 54 of the Commission has been copied above.

■ If we are correct in our conclusion that Art. 6036 does not require knowledge on the part of a violator under it then it is our opinion that the Commission had no authority to require, as it did, in Rule 54 that a well must be intentionally deviated in order for the violator to be subject to penalties. The Commission can exercise only such legislative power as has been lawfully delegated to it. It has been delegated authority to make rules but it has not been delegated the authority to assess penalties for violation of such rules nor the terms or conditions under which such penalties shall be imposed. The obvious basis for this statement is Art. 6036, and our interpretation of it. If the Commission can tell the Legislature and the Courts that the penalties prescribed by the Legislature for the infraction of Commission rules cannot be enforced with respect to Rule 54 unless intent is established, then it can so provide as to all rules, regulations and orders adopted by it and so nullify the legislative will, expressed in Art. 6036, that intent is not an ingredient of the violations described. Rule 54, as to intent, is in conflict with Art. 6036, and hence lack of delegated authority to the Commission to include intent in a definition of a rule, order or regulation by it is evident.[6]

6. In Stewart v. Humble, 377 S.W.2d 830, the Supreme Court in discussing the matter of "intent" as related to the violation of Rule 37 of the Commission stated:

"The trial court found that the deviations of Killingsworth No. 3 and Lathrop No. 6 were intentional. Plaintiffs argue that this finding of intent goes to the question of whether or not the bottomhole locations of these two wells reasonably comply with the Rule 37 permits granted in 1935 and 1941. It is plaintiffs' position that, as a matter of law, an intentionally deviated well does not fulfill the test of

reasonable compliance. Thus, plaintiffs conclude that Stewart had the burden of proving that the bottomhole locations were necessary to prevent waste or confiscation. We do not agree.

"[5] To adopt plaintiffs' position would necessarily mean that an operator who intentionally deviates his well some 5 feet from its surface location can never have the Commission approve his deviated position, while an operator who unintentionally deviates some 10 feet can apply for Commission approval. Logic negates such a result. Whether Stewart has intentionally deviated or not, any alleged 'harm' re-

■ The applicable rule is well stated in Administrative Law, 1 Am.Jur.2d, Sec. 132, p. 944, as follows:

"A legislatively delegated power to make rules and regulations is administrative in nature, and it is not and cannot be the power to make laws; it is only the power to adopt regulations to carry into effect the will of the legislature as expressed by the statute. Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, or impairs, limits, or restricts the act being administered."

This principle is sustained in Harrington v. Railroad Commission, 375 S.W.2d 892, Tex.Sup. Point Twelve is overruled.

Point Thirteen is that the Court erred in its charge to the jury because it failed to submit an issue to the jury as to each appellant inquiring if he intentionally violated any law, rule or regulation of the Commission or had knowledge of such violation. We overrule this Point for the reasons given in our discussion of Point Twelve.

Point Fourteen is that the trial court erred in overruling appellants' objections to the charge to the jury for its failure to inquire as to the existence of a "formal partnership."

■ By the argument made under this Point and the authorities cited, appellants indicate that by "formal partnership" they

mean a conventional or business partnership and not a mining partnership. Since the State by pleading, evidence and argument contend only that appellants were mining partners, we will overrule this Point without further discussion.

Point Fifteen is that the trial court erred in overruling objections to the charge to the jury for failure to submit an issue inquiring as to the existence of a mining partnership between appellants.

■ The State alleged that appellants were mining partners. It is our opinion that this fact was conclusively established and that the submission of an issue to the jury regarding it was not required.

■ All appellants, except Mr. Baton, denied under oath, as required by Rule 93, T.R.C.P., that he was a mining partner. The failure of Mr. Baton to deny the partnership is an admission by him that he was a partner as alleged.

Mr. Baton, called as an adverse witness, testified:

"Q * * * The question was asked you: 'Isn't it true, in truth and in fact, that all of the people in this particular case, Mr. Harrington, Mr. Allgood, Mr. Lutes, and Mr. Godfrey, and yourself, were all in the HAL Company at the time the well was drilled?' That was asked you, wasn't it?

"A Yes, sir.

"Q And isn't this your reply: 'We were all in on the deal to drill the well.' Was that your answer?

"A Yes, sir; I gave that as my answer.

sulting to plaintiffs is the same. In deciding whether an operator in Stewart's position has reasonably complied with the terms of his permit, the Commission's decision should not be controlled by the question of intent. To hold otherwise would be contrary to the long-recognized principle that when the

subject of administration is so vast, complex and complicated, an administrative agency should not be placed in an absolute straight jacket."

See Texas State Board of Pharmacy v. Bloom, 382 S.W.2d 496, Dallas Civ. App., writ pending.

"Q And that is your answer, isn't it?

"A We drilled the well, yes, sir.

"Q That is, you, Harry M. Harrington, Jr., C. W. Lutes, Mr. Allgood, and Douglas Godfrey; that's right, isn't it?

"A Yes, sir.

"Q You drilled the well?

"A Yes, sir.

\* \* \* \* \* \*

"Q Now, then, following up your testimony in which you say you drilled this well together, you five, there was a name involved known as the HAL Company, wasn't there?

"A That's correct.

"Q And the ones who had the interest in the company, so far as this well was concerned, were the five men you named, weren't they?

"A I believe that's right, yes, sir."

We copy and adopt the following statement of evidence from the brief of the State, appellants not denying its accuracy:

" 'HAL' Company was the assumed name that originally stood for Harrington, Allgood and Lutes, and its office was Harrington's own office in the Bramlette Building in Longview. Appellants, as Hal Company, acting through Baton, filed with the Railroad Commission the well record, showing their completion of the well and the SW-1 Form Report certifying 'knowledge' of compliance with all of the Railroad Commission rules, regulations and orders in order to get authority to transport the oil produced off their lease; also the E. B. Monthly production records showing the amount of oil produced from their lease. Appellants had an oral agreement as to their proportionate undivided ownership in the well prior to its drilling and they were to pay their proportionate share of the expenses and did receive their proportionate share of the income from the division order, beginning with the first payment by Humble. Prior to the drilling, appellant Harrington, acting for himself, appellant Allgood and appellant Lutes, had agreed to Allgood's assignment to appellant Baton of one-half of Allgood's one-third interest in the well property, with the agreement for assumption by Baton of his proportionate share of the obligations in the venture. Baton personally furnished the surface pipe at the start of the well and had an oral agreement for his interest with appellant Allgood. Appellants all acted together to finance the drilling and operation by 'pooling the money.'

"It was established without dispute that Texas & Pacific Coal & Oil Co., from which appellants obtained their property interests, had ownership and title to the minerals in the property; that beginning in the fall of 1951, appellants proceeded to secure a 'farmout' agreement from that company and acquired the extent of their rights and title therein by a series of transactions, which were evidenced by a series of letters directed to the company by appellant Harrington for appellants. Such rights and title were later confirmed by legal conveyances, which relate back to the time of the drilling of the well. Appellant Allgood also stated that he originally owned a one-third interest in the well and assigned part of his interest to Baton, and that each of the other appellants paid their part of the costs and expenses involved in the drilling and operation. Appellant Lutes admitted his ownership along with the other appellants in the 'farm-out' from Texas & Pacific Coal & Oil Co. Godfrey, admitted his own-

ership at the time the well was being drilled and the payment of his expenses, but had nothing whatever to do with the drilling or operation. Appellant Baton also confirmed this.

"Appellant Allgood looked to appellant Harrington for progress reports on the drilling, operation, expenses, etc. Appellant Baton also looked to Harrington for all of these matters, going to him and his office to get all information and to sign all reports furnished and prepared by Harrington. Appellant Lutes admitted Harrington acted for appellants in acquiring the lease, and he looked primarily to Harrington as to the operations. Harrington did not testify or refute any of the testimony. The other mining partner, Godfrey, testified he had nothing to do with the drilling or operation. Appellant Baton confirmed this and also the fact that Godfrey was incapacitated with a brain tumor.

"Appellant Allgood testified he did not hire or supervise Carter-Jones Drilling Company in the drilling of the well; likewise, appellant Baton testified to the effect that he did not hire or supervise the drilling company. * * * Harring paid all the bills, which included Carter-Jones' bill; * * *

"As to the conduct of joint operations by appellants, Lutes actually hired the pumper, J. C. Ragsdale, and actually gave him his orders, according to Ragsdale; * * * Appellants were billed by Harrington, as shown, and all paid the expenses of the operations in proportion to their working interests. All of the reports on the operations which were required to be filed with the Railroad Commission were, as heretofore shown, filed for appellants by Baton or Harrington, who took the information from the pumper."

Appellants concede that the five elements of a mining partnership are (1) joint ownership of the mineral leasehold or subsurface mineral estate (2) joint operation of the lease (3) sharing of profits (4) community of interest and (5) mutual agency of one of the parties or a superintendent representing the partnership in the management of the leasehold, citing Wagner Supply Company v. Bateman, 118 Tex. 498, 18 S.W.2d 1052. The Court in this case stated that, "The rule is that a mining partnership arises by operation of law where co-owners work a mine."

Appellants do not discuss all of the evidence which we have recited on this point, but they do make specific objections to its sufficiency in certain respects. These objections we will answer.

Appellants contend that joint ownership of the leasehold is not shown because it is not shown that they all had acquired legal title to their interest in the leasehold at the time of drilling. This is unnecessary. An equitable title will suffice. See 12 Texas Law Review, p. 415 and authorities there cited. When the leasehold here was delivered after the well was drilled in performance of the farm-out agreement, the title acquired related back to the inception of the farm-out agreement, the agreement clearly evidencing such intention. See Sibley v. Pickens, 273 S.W. 897, Amarillo Civil Appeals, no writ history. Appellants cite Indiahoma Ref. Co. v. Wood, 255 S.W. 212, Amarillo Civil Appeals, no writ history. This case does state that a contract to purchase an interest in an oil leasehold by a trustee does not create a partnership liability on the part of the trustee or his principal prior to the execution of the contract. Here, however, the trustee was not sued and his principal was held not liable because the trustee had no authority to bind his principal in making the contract. We believe the Sibley case correctly states the applicable rule of law.

Appellants direct our attention to several cases with regard to the requirement of

"sharing profits." First cited is Bolding v. Camp, 6 S.W.2d 94, Tex.Comm. of App. This case holds that acquisition of an interest in an oil and gas leasehold does not of itself create the owner of the interest a mining partner with other owners. Obviously, this case is not controlling here.

Gardner v. Wesner, 55 S.W.2d 1104, Austin Civil Appeals, writ ref., is a case in which for the loan of certain casing its owner was to receive, if the oil well in which it was to be used was productive, the cost of the casing and ⅛th of the net profits of the well, "but all obligations for drilling and operating were for his (Lessee) account, and my sole interest was to be derived from the net profits resulting from his operation." Clearly there was no joint operation of the leasehold, and the Court correctly so held.

Another case cited is Dunigan Tool & Supply Co. v. Carroll, 60 S.W.2d 296, Austin Civil Appeals, writ ref. This case is based on the decision in Gardner v. Wesner, supra, and holds that joint operation of the leasehold and sharing of profits, as such, not being shown, there was no mining partnership.

Appellants also cite on this phase of the partnership issue Sec. 7 of Art. 6132b, V.A.T.S., Texas Uniform Partnership Act, as follows:

"(1) Except as provided by Section 16 ('Estoppel') persons who are not partners as to each other are not partners as to third persons.

"(2) Joint tenancy, tenancy in common, tenancy by the entirety, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by use of the property.

"(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right

or interest in any property from which the returns are derived.

"(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

* * * * * *

"(e) As a consideration for the sale of a good-will of a business or other property by installments or otherwise.

"(5) Operation of a mineral property under a joint operating agreement does not of itself establish a partnership."

Appellants contend that these articles apply to the partnership issue before the Court. We agree. Appellants do not contend that these provisions require us to hold that a mining partnership is not shown. We hold that they do not so require.

Appellants say that since the well in suit has not produced oil for a year and the lease terminated for nonproduction that the mining partnership, if any, has thereby been dissolved, the effect of which is, they say, to relieve the partners from liability for civil penalties (except the actual wrongdoer). They cite in support Wright v. E–Z Finance Co., 267 S.W.2d 602, Dallas Civ.App., writ ref., n. r. e.

There is no evidence before us that the partnership has dissolved or that the lease has been surrendered to lessor. We do not express any opinion on the right of lessor to terminate the lease or concerning its automatic termination for nonproduction under the facts here disclosed. The mere cessation of business by the partnership, if such be true, is not enough to show its dissolution. Partnership, 44 Tex. Jur.2d Sec. 181, p. 510.

The E–Z case involves a business partnership and the liability of it and its mem-

bers for penalties for usury after the dissolution of the partnership by death of one of the partners. Since no dissolution of the partnership is shown in the case before us, we need not determine what effect such dissolution would have.

We have considered all of the specific objections which appellants have presented under this point and have disposed of them to the best of our ability. Since appellants have not further analyzed the evidence, recited above, to sustain the existence of a mining partnership between appellants, we also refrain from so doing. We have, however, carefully examined such evidence and we find from it that all of the component elements of a mining partnership between appellants is established by the undisputed evidence and as a matter of law. Point Fifteen is overruled.

Point Sixteen is that the court erred in overruling objections to the following portion of the jury charge on the ground that it constituted a global submission of statutes and rules of the Commission:

"* * * this suit is brought by the State of Texas against the defendants for recovery of penalties provided by statute for violations of the laws of this State and the rules, regulations and orders of the Railroad Commission of Texas."

■ The above language of the charge was not contained in any issue submitted to the jury. It was contained in general instructions made by the court with respect to certain issues which were submitted. The statement merely advised the jury of the nature of the suit. It amounted to no more than the court advising a jury that "this is a suit for damages." The instruction was not improper. Certainly it was not harmful. The pleadings were before the jury and they showed the nature of the suit to be as the court instructed. Point Sixteen is overruled.

■ Point Seventeen is that the trial court erred in failing to define the word "violator" as used in its charge.

The word "violator" is found only once in the charge, in the sentence which immediately follows the quotation made by the charge in discussing Point Sixteen. We quote the sentence:

"Under the statute the violator is subjected to a penalty not to exceed $1,000.00, for each day of each violation which you may find from a preponderance of the evidence was committed."

The trial court, in this instruction, necessarily had reference to Art. 6036 which prescribes penalties for any person "violating" the statute, rules, etc. The instruction was accurate and in the language of the statute.

The trial court did not inquire of the jury whether any appellant had "violated" the statute or rules of the Commission. The instructions in which the word "violator" is found preceded issues relating only to the amount of penalties to be assessed which issues were conditionally submitted on an affirmative answer to the Issue I which inquired if appellants' well was bottomed off their lease.

The jury, as reasonably intelligent persons, must have known that when they answered Special Issue I in the affirmative that this was a violation of the rules of the Commission, which were in evidence, otherwise they would not have been asked to assess penalties. We believe it beyond question that the jury understood the meaning of the word "violator" as used in the charge and that definition of it was not required. Point Seventeen is overruled.

■ Point Eighteen is that the trial court in overruling objections to the following portion of the court's charge:

"The amount of penalty, if any, to be assessed for each day of each violation

shall be determined by you in your sound discretion, and in arriving at the amount of such penalties, if any, you may consider such of the following, if any, as you find are established by a preponderance of the evidence and none other: (1) The nature and character of the conduct involved, (2) the degree of culpability of the wrongdoer, (3) the extent to which such conduct offends a public sense of justice and propriety, (4) and heedless and reckless disregard of the rights of others, and (5) the character and extent of the injury inflicted. The penalty, if any, should be in an amount which you find from a preponderance of the evidence will compel respect for the law by the defendants and others, and will deter the commission of like acts in the future by the defendants and others."

The objections to these instructions were that they were extraneous to any violation of the pertinent statutes and rules and that they constituted a comment on the weight of the evidence.

This charge was not a comment on the weight of the evidence. All of the enumerated matters which the jury was told could be considered were carefully safeguarded by the use of the words "if any." Adams v. McHam, 310 S.W.2d 145, Amarillo Civ.App., writ ref., n. r. e.

■ It is proper, under Rule 277, T.R.C.P., for the court to give explanatory instructions in the charge, " * * * even in the nature of general charges, whenever there is good need for same to properly aid the jury. * * *" Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481, quoting approvingly from 20 Tex.Law Rev. p. 36.

■ It is the duty of the court to instruct the jury as to the proper measure of damages in a proper case. Damages, 17

Tex.Jur.2d Sec. 285, p. 344. The same text Sec. 299, p. 367, states, "The jury should be instructed as to the particular elements that they may properly consider in the particular case on trial in ascertaining the amount of the award of damages."

■ While penalties are sought here, not damages, there are proper matters which a jury may consider in the exercise of its discretion in assessing penalties, within legal limits, which are authoritatively stated to be:

"The basic rule may be said to be that the amount to be awarded in any case is measured by the rule of just punishment, rather than that of fair compensation. And the amount of the award depends, among other things, on the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibility of the parties concerned, and the extent to which such conduct offends a public sense of justice and propriety. Although the amount should be large enough to command respect for the law and to deter others from similar infractions, it should not be excessive or oppressive." 17 Tex.Jur.2d p. 255–6.[7]

The trial court carefully incorporated in its charge these judicially approved elements for consideration by the jury and we approve its action. It seems to us that these explanatory instructions are as much to the benefit of appellants as to the State, especially so since appellants do not admit that they were conscious wrongdoers. Point Eighteen is overruled.

■ Point Nineteen presents objections to that portion of the court's charge, copied above, which relates to the instruction that the penalty assessed should be in an amount that will compel respect for the law and deter the commission of similar acts, the objections being that it is a comment on the

---

7. The text is discussing exemplary damages, but such damages are in the nature of penalties.

weight of the evidence and does not condition the assessment of penalties on a finding that any violation was intentional.

We do not consider this portion of the charge to be a comment on the weight of the evidence for the reasons stated in our discussion of the preceding point.

We also do not agree with the contention that it was essential for the State to prove that violation of Rule 37 was intentional before penalties could be assessed under Art. 6036. We have given our reasons for this conclusion in discussing Point Twelve. Point Nineteen is overruled.

 Points Twenty and Twenty-one are that the court erred in overruling objections that the following portion of its charge is a comment upon the weight of the evidence and instructs the jury upon a legal presumption and was prejudicial, and that it fails to incorporate the requirement that the violation be intentional:

"Each of the defendants at all pertinent times is charged with knowledge of the laws of the State of Texas and the rules, regulations, and orders of the Railroad Commission. In order to drill the well in question, a permit to drill the same had to be obtained from the Railroad Commission, and the well drilled under such permit was required to be bottomed on the defendants' lease."

Appellants argue this point as though this presumption stated in the Court's charge was rebuttable. This is incorrect. "All persons are conclusively presumed to know the law." 23 Tex.Jur.2d Sec. 73, Evidence, p. 114. The instruction given was appropriate under this record. Without this explanation of the law, the jury would have been easily misled.

 Nor was the instruction, in our opinion, a comment on the weight of the evidence. The trial court was, in giving this instruction, merely performing his

duty and instructing the jury on the law applicable to the fact issues submitted to it. 31 Tex.Jur.2d, Instructions, Sec. 57, p. 577.

Appellants state that it is not always necessary in drilling an oil well to obtain a permit from or consent of the Commission. No authority to this effect is cited. The instruction applied only to appellants' well, and they do not deny that, as to it, they were required to obtain a permit from the Commission.

Points Twenty and Twenty-one are overruled.

Point Twenty-two is that the trial court erred in submitting Special Issue 2 inquiring of the jury what a reasonable penalty would be for each of the sixteen days on which the well was drilling over objections that the issue assumes that the well was wrongfully drilled and assumes existence of conditions precedent not established by the evidence.

We presume that the condition precedent referred to is that the well was intentionally deviated. We overrule this contention for reasons heretofore given.

 We also overrule the first contention which is based on the argument that the well was drilled straight for a ways before it started to slant and that the straight drilling was lawful. This is undoubtedly correct. However, we hold that a well is an entity, having a top and a bottom, and not divisible into good and bad segments. This well, from the surface to its bottom, was an unlawful well. Point Twenty-two is overruled.

Appellants' Point Twenty-three reads:

"The Court erred in submitting Special Issue No. 4 inquiring as to a reasonable penalty for each of the 3,650 days that the well was operated over the following objections of the defendants:

"(a) Such issue assumes facts not established by the evidence;

"(b) Such issue is a comment upon the weight of the evidence;

"(c) Such issue is not supported by the plaintiff's pleadings;

"(d) Such issue erroneously assumes that the operation of the well in question is governed by state-wide Rule 37;

"(e) Such issue erroneously assumes that each of the defendants operated the well from its inception;

"(f) Such issue assumes the existence of a partnership or agency among the defendants;

"(g) There is no evidence upon which to base the submission of this issue;

"(h) There are no pleadings upon which to base the submission of this issue."

Special Issue No. 4 reads:

*"SPECIAL ISSUE NO. 4:*

"What sum of money, if any, do you find from a preponderance of the evidence to be a reasonable penalty for each of the 3,650 days said well was operated?

"Answer in dollars and cents, or none.

"ANSWER: $80.00"

We have held in sustaining Point Six that the evidence does not conclusively show that this well produced oil for 3,650 days. If by the word "operated," as used in this issue, is meant production of oil, then this point must be sustained because it assumes an unproven fact. Subject to our determination of this question later in this opinion, we overrule the other objections to the issue. All of the objections except that it is a comment on the weight of the evidence have been discussed and determined under other points. In view of our disposition of the following point it is not necessary that we determine this contention.

Point Twenty-four is that the trial court erred in not defining the word "operated" in Special Issue No. 4, copied above.

█ It is our opinion that the trial court should have acceded to appellants' request and defined the word "operated" in Special Issue 4.

This word, under normal conditions, is a word of common usage and understanding. It is used here, however, under abnormal circumstances. There is a large record containing the testimony of expert witnesses and numerous exhibits which are not readily absorbed by the mind. The jury very well could have believed, since they were not queried about the matter, that the Trial Judge had found, perhaps from some of these complex exhibits, that this well had produced oil for each of the 3,650 days stated in the issue. The State so contends now. The Trial Judge, however, did not so find. It is in the record that he made these observations after the verdict:

"MR. HARRINGTON: Then you are finding on the basis of 3,650 days for the well not being plugged, rather than on the basis that it had produced that many days?

"THE COURT: That is correct. Of course, it was submitted to the jury with the word 'operated 3,650 days.'

"MR. HARRINGTON: The Court's judgment is on the basis that it has not been plugged that number of days?

"THE COURT: That it violated Rule 37 for 3,650 days."

We concur in the Trial Judge's refusal to find that this well produced oil for 3,650 days and agree with him in regard to his interpretation of Rule 37 and his conclusion that this well violated its provisions as long as it remained unplugged. Our

problem is simply to determine if this issue, as framed, could have influenced the jury in assessing a greater penalty than it would have assessed if it had been instructed that failing to plug the well for 3,650 days was the only wrongful act which appellants had committed on 3,650 days. The amount of penalties assessed in this case for operating the well for 3,650 days is about $292,000.00. We believe a jury assessing such huge penalties should know exactly for what violation such penalties are assessed. The jury has a very wide discretion in cases of this character. It may fix the penalty at one cent or $1,000.-00 a day. To wisely exercise this discretion it should certainly know what offense has been committed and what the facts and circumstances are concerning it.

We believe that the trial court should have defined the word "operated" in Special Issue No. 4, and we sustain this point. In view of another trial, we suggest that maintenance of the well in an unplugged condition be submitted to the jury for assessment of penalties if this violation is again relied upon by the State.

 Points Twenty-five and Twenty-six are that Art. 6036 is unconstitutional for the reason that it violates Art. 1, Sec. 19 and Art. 1, Sec. 13, of the Constitution of Texas, Vernon's Ann.St., and Amend. Art. 14, Sec. 1 of the Constitution of the United States.

Art. 1, Sec. 19 of our Constitution is the "due course of law" provision and Sec. 13 prohibits the imposition of excessive fines. The Federal Constitution provision referred to is the "due process of law" provision.

The contentions under these points were answered adversely to appellants by this Court in Culver v. Smith, 74 S.W.2d 754, writ ref., opinion by Associate Justice Blair, from which we quote:

"Appellants further contend that the penalties of 'not more than One Thousand Dollars ($1,000.00) for each and every day of such violation' of any provision of the act as provided in article 6036, as amended by Acts of the 42d Legislature, 1st Called Session, c. 26, § 3 (Vernon's Ann.Civ.St. art. 6036), render the act void as being in contravention of section 13 of article 1 of the Texas Constitution, in that it imposes excessive fines and authorizes unusual punishment, and as being in contravention of section 19 of article 1 of the Texas Constitution, and of section 1 of article 14 of the Amendment to United States Constitution, in that it permits and authorizes the deprivation of their property without due course of law, and of their liberty without due process of law. We do not sustain these contentions.

\* \* \* \* \* \*

"The fact that article 6036 imposes a penalty of 'not more than one thousand dollars per day' instead of a flat penalty of $1,000 per day, thus permitting the imposition of a small penalty of perhaps only a few cents per day, has been held to be sufficient within itself to take such statute out of the constitutional inhibitions sought to be invoked by appellants. Noble v. Carlton, Governor of Florida, et al. (D.C.) 36 F. (2d) 967."

These Points, the last Points in appellants' general brief, are overruled.

Appellant Baton has filed a separate brief which we will now consider.

Appellant Baton was exonerated from liability for penalties for the drilling of the well. He was assessed penalties of $2.50 a day for 3,650 days for operation of the well.

 Many of the points in appellant Baton's brief are to the same effect as points made in appellants' general brief. These points will not be restated or discussed. Our rulings on them are the same

as indicated above. We will discuss only additional points made by Mr. Baton. His Fifth Point is that the verdict and judgment against him is so against the great weight and overwhelming preponderance of the evidence as to be clearly wrong. Since this cause is being reversed and remanded for a new trial insofar as the judgment went against Mr. Baton, we will not recite more of the evidence upon which the judgment was based because it may not be the same upon retrial. The evidence referred to above is sufficient, in our opinion, to establish the legal liability of Mr. Baton as a member of a mining partnership for penalties for violation of the rules of the Commission by the partnership in the production of oil from and the operation of this well,[8] and that a finding to such effect is not against the overwhelming weight and preponderance of the evidence, and is not clearly wrong or manifestly unjust.

Mr. Baton's Point Seven is that the trial court erred in admitting in evidence letters written by Mr. Harrington to an oil company over his objection that such letters were hearsay as to him and were written before he acquired a conveyance of an interest in the oil and gas lease here involved.

Appellant does not state what these letters contain, but from the record we learn that they related to the assignment of the oil and gas lease to Harrington, Allgood and Lutes in which Baton subsequently acquired an interest and on which leasehold the well in suit was drilled. The letters were admitted to show a mining partnership between appellants. Mr. Baton did not deny this partnership, hence the admission of these letters could not have harmed him. We are further of the opinion that a mining partnership was established, as a matter of law, between appellants independently of the content of these letters. This Point is overruled.

We affirm the judgment of the trial court assessing penalties against Harrington, Lutes and Allgood and refusing to assess penalties against Baton and Godfrey for the sixteen days on which the well in suit was drilled. In all other respects, the judgment is reversed and this cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; in part reversed and remanded.

## ON MOTION FOR REHEARING

The State asserts that we erred in sustaining appellants' Point Twenty-four and holding that the word "operated" used in Special Issue No. 4 should have been defined for the reason that the record does not show that appellants properly preserved such Point in that they failed to submit a definition of such word and they requested submission of a similar issue using the same word, "operated," without defining it.

We will not explore these reasons for altering our opinion because even though Special Issue No. 4 stands unscathed it will not support a judgment for the penalties assessed by the jury in answering such issue.

The State contends otherwise, saying, " * * * this Court erred in failing to render judgment based on the undoubted operation of the well for the 3,650 days it was *operated unplugged.* * * * This was the basis for the Trial Court's judgment."

This is an incorrect appraisal of the trial court's basis for judgment. That basis was, as clearly shown by his remarks copied in our opinion, that the well was "unplugged" for 3,650 days, not that it was "operated unplugged." The court also stated that "it," not plugging the well, violated Rule 37 for 3,650 days. Rule 37 merely states, in this respect, that a well drilled in violation of it "shall be plugged."

8. See 40 Am.Jur., Partnership, Sec. 196, p. 266-7; 68 C.J.S. Partnership § 182, p. 637.

It does not provide that a well shall not operate unplugged.

 By no stretch of the imagination could the assumption made by the court in Special Issue No. 4 that the well was operated 3,650 days be tortured into an assumption that the well was merely in an unplugged state for 3,650 days. It is, of course, undisputed that the well was unplugged for this period of time, but if the State wished the jury to assess a penalty for this violation, it should have requested submission of an appropriate issue. Furthermore, it is the duty of the trial court to submit controlling issues made by the pleadings and evidence. Rule 279 T.R.C.P. We apprehend none will deny this was a controlling issue.

The State's motion and all appellants' motions for rehearing are overruled.

We have not heretofore adjudged costs in this case, and we called upon all parties to make suggestions relative thereto. After considering the suggestions made, we adjudicate costs as follows:

Trial Court Costs

 As no judgment against appellant Baton for any amount has been rendered the assessment of such costs against him will abide the event.

 Appellants Harrington, Allgood and Lutes are each assessed one-third of one-fourth of such costs. Assessment of the remainder of such costs will abide the event.

Costs of Appeal

 Appellants Harrington, Allgood and Lutes are each assessed one-third of one-fourth of such costs.

Three-fourths of such costs are assessed against the State of Texas.

No appellate costs are adjudged against Mr. Baton.

Motions overruled.